HEIRS OF PABLO ZAYAS BERRÍOS, ETC., Plaintiffs and Appellees, *v.* JUSTO BERRÍOS, Defendant and Appellant.

No. 588.        Decided June 5, 1964.

---

538

*Víctor M. Pons* for appellant. *Edelmiro Martínez Rivera* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

Justo Berríos, appellant herein, alleges that appellees Luis and Juan Zayas Salgado and their mother María Luisa Salgado Díaz, who died during the prosecution of this litigation, are placed between the horns of a dilemma; that is, that in view of the particular circumstances of the present controversy, either the defense of res judicata lies or the appellees lacked title to initiate this action of revendication of real property. As we shall hereinafter see, the defense of res judicata is supported by the evidence and other circum-

stances of the case, for which reason reversal of the judgment rendered by the trial court is in order.

Appellees filed a complaint against appellant Justo Berríos for the purpose of revendicating a parcel of 15 cuerdas not described in the complaint which they alleged formed part of a property of 42 cuerdas belonging to the predecessor of appellees and which the latter never relinquished, in whole or in part; that that parcel was unlawfully and fraudulently included by the mercantile José Julián Pagán e Hijos in a dominion title proceeding of a property of 65 cuerdas which was afterwards acquired by appellant, and that the latter lacked valid title to the real property in question.

Prior to the filing of this complaint appellant had obtained judgment, which is now final and unappealable, against Diego Torres Rodríguez, whereby appellant was adjudged sole and legitimate owner of the said 15 cuerdas.

The Zayas brothers, appellees herein, testified, and on this all the parties were agreed, that the parcel of 15 cuerdas object of this action was the same one which was the object of the action of revendication brought by appellant against Diego Torres Rodríguez and in which the judgment referred to in the preceding paragraph was rendered; that the sale of that parcel from appellees to Diego Torres was simulated, and that in that action the latter represented the interests as well as the defense of the title and rights of the former to the aforementioned property. For a better understanding, we copy part of the testimony of appellee Juan Zayas Salgado, as it appears from the transcript of the record.

"Q. . . . Tell me something, do you know Diego Torres?
A. Yes, sir.
Q. Diego Torres Rodríguez?
A. Yes, sir.
Q. *Do you know whether those 15 cuerdas which you are claiming in this same action are the same 15 cuerdas object of an action in this same court between Justo Berríos and Diego Torres?*

A. *Yes.*

Q. *Are they the same?*

A. *Yes.*

Q. *Did you hear about that action between them?*

A. *Yes.*

Q. You heard. Did you know, do you know why Diego Torres alleged in that action that he is the owner of these 15 cuerdas which are claimed now, why he alleged that he was the owner?

A. *Because he asked my brother and my mother to convey the property to him, to sign a deed so that he could file a dominion title proceeding for the purpose of recording the property,* and then my brother and my mother signed a deed in order to record the property.

Q. And you heard about that?

A. Yes, sir.

Q. Did you know and always knew that *that sale which* your brother and your mother made to Diego Torres of this property of 15 cuerdas *was a simulated sale,* that there was no such sale, that there was only. . . . ?

A. Yes, sir.

Q. . . . for him to make a dominion title proceeding?

A. *Simulated;* the entire property and he also included that of Regina Rivera. [Italics ours.] [Tr. Ev. 283–84.]

.       .       .       .       .       .       .       .

Q. That's why, if and when the sale was made to Diego Torres it was made only for the purpose of a dominion title proceeding of the 42 cuerdas, why did they not convey to him in that deed the 42 cuerdas and conveyed only some time in 1943 14½ cuerdas, that is, these 15 cuerdas which are in litigation, why?

A. *Because he conveyed it,* my brother and my mother conveyed it to him in the deed, without *his paying any money, for him to record the property and then give us the deed.* [Italics ours.] [Tr. Ev. 284–85.]

.       .       .       .       .       .       .       .

A. I know that my mother and my brother signed because Diego Torres asked them to do it so he could record the property, *because he, Justo Berríos, claimed that he owned a share of that property and we had no record, and then Diego Torres*

*acquired it in order to record the property, you see, in order that we* could have . . .

Q. Because of that, do you know that the conveyance was simulated and that it was only for the purpose of recording the 42 cuerdas?

A. Without his paying any money. [Italics ours.] [Tr. Ev. 285–86.]

.      .      .      .      .      .      .      .

Q. And you always *knew that that was a lie, that that conveyance was simulated?*

A. Yes.

Q. But why, if the property belonged to you, the Zayas, *why did you not make the dominion title proceeding in order to record it,* why did Diego Torres have to do it?

A. *Because we did not know, we are persons who do not know, he worked on the same property and looked after us and did everything that had to be done, he was, and has always been, the one who did everything.*

Q. But, Diego Torres is not a lawyer.

A. No, but he is a person who knew and since we are ignorant, we do not know anything. . . .

Q. Why did you not entrust the matter to a lawyer for him to record the property, could you not take it to him to do it?

A. We did not know anything about that." (Italics ours.) (Tr. Ev. 286–87.)

Further on, and referring to the litigation between Justo Berríos and Diego Torres, appellee Juan Zayas stated the following:

"Q. And did you hear about that action between them?

A. Yes.

JUDGE:

He already said it.

MR. PONS:

Q. Did you *have any participation in that action?*

A. I came here to testify.

Q. You were a witness, whose witness?

A. Diego Torres'.

Q. Of Diego Torres. *So you co-operated with him and did all you could to help Diego Torres succeed in the action against Justo Berríos?*

A.   Because he told us that we could say that the land *was
his so he could record the property for us and give us the deed.*

Q.   And you came here, before this court, and testified as
a witness?

A.   Yes, sir.

Q.   And you testified under oath?

A.   Yes, sir. [Italics ours.] [Tr. Ev. 288.]

Q.   Ah, he told you to say that?

A.   To say that.

Q.   And you said it here under oath?

A.   I said it here and the judge will forgive us because we
are so ignorant, we did not know whether it was bad to say
that and since he told us to say it, we came here to say it and
beg the judge to forgive us.

Q.   Then, that was true?

A.   *It was not true because he had not purchased the prop-
erty from us at all.*

Q.   And it was not true at that moment when you were
testifying that Diego Torres was the owner of the land in liti-
gation, namely, that of 15 cuerdas; that was not true, yet, at
the request of Diego Torres you told the court under oath that
you had sold it to Diego Torres and that Diego Torres was the
owner?

A.   *I have not sold to anyone.*

Q.   But you said it?

A.   I said it because he told us to come and say it.

Q.   And you said it under oath. Did you not say, also, that
he had paid to you a certain amount of money for that property?

A.   I don't remember any of that, he did not give us money.

Q.   Now, the truth is that while that action between Diego
Torres and Justo Berríos was pending, the 15 cuerdas, these,
the 15 cuerdas, belonged to you, right?

A.   Yes, sir.

Q.   And then, what Diego Torres did was to defend that
land for you?

A.   Yes, and he operated it and gave a part to us.

Q.   That's why, *and he was defending it for you, litigating
for your benefit, and you knew that if Diego litigated with Justo
Berríos he did it to defend the 15 cuerdas for you, right?*

A.   Yes, sir.

Q. You knew that. And since you knew that, you co-operated with him in everything you could in that action?

A. Yes, sir.

Q. To the point that in that action you came to say what he told you to say, even if it was not true?

A. Yes, I beg your forgiveness, but it was true that he told us to come to say it, and since we did not know, we came to say what he told us to say.

Q. Tell me something, and the expenses of that action, who paid them, who paid the expenses for that action of Diego Torres against Justo Berríos?

A. The expenses of what?

Q. Well, if it was necessary to purchase stamps, if it was necessary to make a trip, to get witnesses and procure documents, who paid those expenses?

A. *He did that.*

Q. *He paid for them?*

A. *Yes.*

Q. So, he did it for your benefit, without any interest other than to help you acquire your property . . . . ?

A. Because he worked.

Q. *. . . so he paid all those expenses?*

A. *Because he worked, forgive me.*

Q. And you, of course, gave Diego Torres, who was defending your rights, all the information which you had on this matter, right?

A. Yes.

Q. On the ownership of that property. *Your mother, María Salgado, was living at the time of that action?*

A. Yes, sir.

Q. And she also co-operated with Diego Torres in the defense of that action and also appeared as witness, right?

A. *Yes, sir.*

Q. And your brother Luis also?

A. Also.

Q. Co-operated in the defense?

A. Yes, sir.

Q. And served as witness?

A. Yes, sir.

Q. So, since the property was yours, the one litigated in that action, at any time you could say to Diego Torres: look,

abandon that matter and do not defend us any more; you were the owners, right?

A.   Do not defend us against what?

Q.   Because the only thing which Diego Torres did in that action was to defend your rights for your benefit and, consequently, you could tell Diego Torres at any time, look, abandon this matter, we do not wish to fight over this property; you could do it, right?

A.   He defended us . . . .

MR. MARTÍNEZ:

That is speculative.

A.   . . . . *because we were poor, and since he always worked on the property and operated it and helped us, he defended the property for our benefit because Justo Berríos wanted to take the property away from us.*

MR. PONS:

Q.   Now, *the ones who claimed and who had an interest in the property and in the action as owners were you?*

A.   Yes, sir, *we were, we are the owners of the property.*

Q.   So, what Diego Torres did in that case was *to render services to you for the defense of your right?*

A.   *Because he worked on the property and he gave us a part and kept the rest.*

Q.   *He also had a personal interest because he operated the property* and planted something on the property?

A.   *He worked and gave a part to us and kept the rest, and he defended us and took care of everything.*

Q.   How long had Diego been working on that property, on the 15 cuerdas?

A.   Well, he always did, as far as I can tell; he always worked for us; he worked on one of his properties and worked on that property of ours and on that other property of 50 cuerdas of Bonnin, where he also worked." (Italics ours.) (Tr. Ev. 297–302.)

Luis Zayas testified the following:

"MR. PONS:

Q. *Tell me, do you know whether the property which you claim in this action from Justo Berríos is the same property* involved in an action before this same court between Justo Berríos and Diego Torres?.

A. *Yes, sir.*

Q. Did you hear about that action?

A. *I did.*

Q. *Did you intervene in that action in any manner whatsoever?*

A. *I intervened.*

Q. How did you intervene?

A. *I intervened because Diego Torres asked us to transfer to him the property of 42 cuerdas, the 15 and the 27 cuerdas, for him to make a dominion title proceeding, so he could give us the deed to the property, because we had certain papers and many of them disappeared.*

Q. And did he explain why, if he could make a dominion title proceeding; you could not do it?

A. We could not do it.

Q. Why not?

A. Because we are poor and we could not make the dominion title proceeding; we had no money.

Q. Then, he was going to pay for you all the expenses of the dominion title proceeding?

A. His good faith, you could see that it was.

Q. That it was so?

A. Yes.

Q. And it was for the purpose of recording in your name all the 42 cuerdas?

A. The 42 cuerdas.

Q. Yet, in 1943 you and María Salgado, by public deed sold to Diego Torres not all the 42 cuerdas but the 15 cuerdas involved in this action, right, although describing them as having an area of 14½ cuerdas?

A. The 15 cuerdas; then he asked me, Luis Zayas, and María Salgado, to make a deed because Justo Berríos wanted to include them with the 50 cuerdas which he purchased from Cándido, from Bonnin.

Q. Yes, *and when the 15 cuerdas were part of the 42?*

A. *Yes, sir.*

Q. But why, if the purpose was . . . then when you conveyed the 15 cuerdas to Diego Torres *there was already a controversy between Diego Torres and Justo Berríos over those 15 cuerdas?*

A. Already uncle Justo Berríos wanted to take the 15 cuerdas away from us.

Q. He wanted to take them away already?

A. Yes.

Q. And had he had any judicial controversy involving the 15 cuerdas with you or with Diego Torres?

A. Because Diego Torres worked for us on the 15 cuerdas; then he explained the situation to us and said that he would defend us as much as he could.

Q. Then, when you *sold or simulated the sale of the 14½ cuerdas to Diego Torres you did it knowing that there was a controversy over the ownership of those 15 cuerdas with Justo Berríos?*

A. Because afterwards, when he purchased the 50 cuerdas, he wanted to include the 15 cuerdas which belong to us in the 50 cuerdas.

Q. That is, Justo Berríos wanted to be owner of the 15 cuerdas?

A. Of the 15 cuerdas of land.

Q. *And you conveyed them to Diego Torres so that Diego Torres could litigate with Justo Berríos?*

A. *Yes, sir.*

Q. And Justo Berríos and Diego Torres actually litigated over the 15 cuerdas?

A. Over the 15 cuerdas.

Q. The same 15 cuerdas that are now claimed?

A. Yes, which belong to us.

Q. And he did it, not for himself but for your benefit?

A. For our benefit.

Q. With your consent?

A. Yes, sir.

Q. *Because you instructed him to do it, to fight over the 15 cuerdas for your benefit?*

A. *Yes, sir.*

Q. But at no time the 15 cuerdas belonged to Diego Torres, they were always yours?

A. He owned them, you see, but it was in that understanding.

Q. *In that understanding that you were making a simulated sale to Diego Torres, but you continued to be the owners?*

A. *Owners of the 15 cuerdas.*

Q. . . . of the 15 cuerdas? So that he, as the person having more resources than you, would litigate over those 15 cuerdas *and defend them for your benefit?*

A. *Yes, sir.*

Q. *And you learned about the action that was pending?*

A. *Yes, sir.*

Q. . . . that was brought in court and you co-operated with Diego Torres in the defense of the 15 cuerdas?

A. Yes, sir.

Q. You co-operated in every sense; *the defense of the 15 cuerdas was made at all times with your consent?*

A. *Yes, with our consent.*

Q. *And for your benefit?*

A. *And for our benefit.*

Q. *And by your express will?*

A. *Our will.*

Q. *That Diego would defend you in that action?*

A. *Yes, sir.*

Q. And in that action you testified as witness?

A. Yes, sir.

Q. Your mother, María Salgado, also testified?

A. Also.

Q. As a witness?

A. Uh-huh.

Q. And your brother Juan also?

A. He also testified.

Q. He also testified as a witness. Do you remember whether in that action you testified under oath that the property of 15 cuerdas which is now in litigation and which was litigated in that action belonged to Diego Torres?

A. In that sense it belonged to Diego Torres always.

Q. Did you testify or did you not testify that you had sold it to him?

A. *Yes, because at least he told us to say that because he was defending us.*

Q. And although it was not true that they belonged to him, you testified under oath here in court that they belonged to him?

A. Of course, as he told me to say.

Q. At his request?

A. Yes.

Q. *You also testified how much he gave you for those 15 cuerdas?*

A. *He did not give us one single penny.*

Q. But you testified here in court that he had paid you?

A. He told us, because he included the property of Regina Rivera in the proceeding, and it was not because he purchased it from her because it still belongs to Regina Rivera.

Q. In that case you did not say that the sale which you had made to Diego Torres was for the purposes of registration?

A. Well, we testified here as we were told to do; I testified that way because he told us how to testify.

Q. And although you knew that it was not true, you did not hesitate to say what he told you to say?

A. About . . . . ?

Q. About the sale of the property you made to him?

A. Well, yes; that the property had been sold to him in that manner.

Q. No, but you did not say one thing or the other; you simply said that you had sold it to him?

A. That it had been sold to him.

Q. And you said that it belonged to him at that moment.

A. Well, yes, because he was assuming our defense at that moment.

Q. Did he defend it at any time for your benefit?

A. Yes, for us.

Q. But at that time nor at any other time, did it belong to him?

A. No, it did not belong to him.

Q. But you said that it was, that it belonged to him in that action.

A. Well, yes, because at that time he told us to say that the property belonged to him. [Italics ours.] [Tr. Ev. 311–17.]

. . . . . . . .

Q. Because he told you. You were asked then: How did he pay you, in cash? And you answered: in cash. Was it not by check? No, sir. And that money, who received it, did you? I did. Did you receive it in the presence of the notary? Yes, sir. Did you testify that?

A. He told us to say that.

Q. You testified all of that knowing that it was not true, because he asked you to say it?

A. Yes.

Q. So, in the course of that action by Diego Torres against Justo Berríos you were all the time with him, co-operating with him?

A. Since he co-operated with me.

Q. You gave him all the help you could?

A. *That I could.*

Q. Because you believed that what he was doing was litigating for your benefit?

A. *Yes, sir.*

Q. Your benefit and your brothers'?

MR. MARTÍNEZ:

He is repeating all that.

MR. PONS:

Well, that is all." (Tr. Ev. 320–21.) (Italics ours.)

In answer to an interrogatory of appellant the appellees have admitted that there is no document, private or public, whereby Diego Torres has returned to them the title to the said 15 cuerdas.

The evidence introduced in appellant's case against Diego Torres Rodríguez is substantially the same as that presented in the trial court in the instant case.[1] The trial judge, who presided at both the first case of revendication and this case, stated in that case that he had found proved the chain of appellant's title and hence ruled that the latter was the sole and legitimate owner of the said parcel of 15 cuerdas. The trial judge concluded that Luis and Juan Zayas Salgado never held the possession of the 15 cuerdas object of the controversy; that Diego Torres held the possession of the parcel in bad faith as respects appellant; and that the sale of the parcel made by appellees to Diego Torres was void and without juridical value.

---

[1] On this point, see *Millán* v. *Caribe Motors Corp.*, 83 P.R.R. 474, 487 (1961).

   ■ In order ;to determine whether the twelfth error assigned to the trial court was committed, that is, whether the defense of res judicata should have prospered, we believe that there is perfect identity of the thing and the cause, since the same real property is the object of claim in both cases.[2] The judgment in the previous case is final and unappealable. There remains to decide whether or not there was identity of parties and the capacity in which they acted (identity of representation). *Bolker* v. *Super. Ct.*; *Sosa, Int.*, 82 P.R.R. 785, 792–93 (1961).

Section 1204 of our Civil Code (31 L.P.R.A. § 3343) provides that *"It is understood that there is identity of persons* whenever the litigants of the second suit are legal representatives of those who litigated in the preceding suit, or when they *are jointly bound* with them or by the relations established by the indivisibility of prestations among those having a right to demand them, or the obligation to satisfy the same."[3] (Italics ours.) The two cases in which this Court had occasion to consider this question more directly, and in which it was held that there was no identity of parties, are distinguishable from the present case. In *Camacho* v. *Catholic Church*, 72 P.R.R. 332 (1951), we concluded that the defense of res judicata was not available because there was no identity of persons, since in the first case plaintiff had brought the action against the Congregation of the Mission of the Paulist Fathers and the complaint was dismissed, while in the second the Catholic Church was sued. The previous complaint against the Congregation was dismissed because, if it was *ex contractu*, it did not lie because the contract involving the vault profaned had been made by plaintiffs with the Catholic Church, and if it was *ex delicto*, it had prescribed.

---

[2] It is worth noting that the legal representative of Diego Torres in the previous action was the same as that of the appellees in this case.

[3] Other statutory provisions on the matter of res judicata are contained in 32 L.P.R.A. § 1793 and Rules 6.3 and 7.5 of the Rules of Civil Procedure.

Hence, the question of a possible breach of contract was not decided in the first action, and, therefore, the defense of res judicata was not valid because there was no adjudication of the question on the merits nor identity of parties. In *Irizarry v. Díaz*, 35 P.R.R. 132 (1926), Irizarry sued for damages caused to him and to his wife by certain words uttered by Díaz Ojea in the presence of other persons. In the first action involving the same question brought by the wife it was held that she had no right thereto because the action accrued to the conjugal partnership. It was held that the plea of res judicata was not available because there was no identity of persons, since the first case was brought by the wife personally, though assisted by Irizarry, while in the second she appeared as a partner of the conjugal partnership with her husband. The fact is that the adjudication in the first case was not on the merits of the question and, furthermore, there was no identity of persons between both because the first action was filed by the wife personally and the second in the name of the conjugal partnership. Rather it could be said that there was no identity of representation.

■ ■ It is evident from the testimony of the Zayas brothers that in the first action for revendication of the parcel of 15 cuerdas defendant Diego Torres Rodríguez was a purely nominal party. The true defendants, who concealed themselves behind the said Diego Torres, and the real party, actually interested as defendant in that action, were the present appellees, so that the former and the latter were so jointly bound that, for the purposes of the application of the doctrine of res judicata, the requirements of identity of the persons of the litigants and the capacity in which they appeared was met in the case. The Supreme Court of Spain has ruled that "juridically there is identity of persons, although physically they are not the same who litigate in the two actions, whenever the person who litigates in the second action exercises the same action and invokes the same grounds

and relies on the same titles as in the first, for that implies juridical solidarity between plaintiffs referred to in § 1252" (§ 1204 of the Civil Code of Puerto Rico). Judgments of June 15, 1899, and of March 11, 1949, of the Supreme Court of Spain (87 *Jurisprudencia Civil* 497, and III-26 *Jurisprudencia Civil* 165, 172); 8-II Manresa, *Código Civil Español* 242–43 (5th ed.). See article by Professor Jaime Guasp, entitled *Los límites temporales de la Cosa Juzgada*, 1 *Anuario de Derecho Civil* 435, 443, and 467 (1948); Coviello, *Doctrina General de Derecho Civil* 632; Inquiry No. 68, 143 *Revista General de Legislación y Jurisprudencia* 116, 122 (1923). In Restatement, Judgments § 85, comments, pp. 408–409 (1942 ed.), it is said that "One who created apparent ownership in another may be bound by actions brought by or against that other as apparent owner." On the testimony of the Zayas brothers it must be concluded that the identity between appellees and Diego Torres was absolute to the point that in law, in the first action for revendication of the said parcel of 15 cuerdas, the party defendant was in reality the appellees, who actually were the ones who derived benefit from the action of the nominal defendant in that action and actually *controlled* his action. The defense in that case was interposed for the benefit of appellees, and they had ample opportunity to defend their rights on that occasion. So much so that if Diego Torres had been successful in that action, he would have transferred to them the title to the real property which they now claim. *Wolff* v. *Du Puis*, 378 P.2d 707, 709–10 (Ore. 1963); *Hudson* v. *Western Oil Fields, Inc.*, 374 P.2d 403, 405 (Colo. 1962); *United States* v. *United Air Lines, Inc.*, 216 F.Supp. 709, 725–31 (1962); *Caterpillar Tractor Co.* v. *International Harvester Co.*, 120 F.2d 82 (3d Cir. 1941); 139 A.L.R. 9; *Developments in the Law of Res Judicata*, 65 Harv. L. Rev. 820, 855–65 (1952); Restatement, *supra*, §§ 84 and 85. Obviously the application in this case of the doctrine of res judicata does not defeat the

ends of justice, nor is there involved in this controversy any consideration of public policy, as stated in *Millán, supra,* in contrast with *Pérez* v. *Bauzá,* 83 P.R.R. 213 (1961). See, also, *Souchet* v. *Cosío,* 83 P.R.R. 730, 735–37 (1961).

In view of the foregoing, we need not consider the remaining 13 errors which appellant alleges were committed by the trial court in its findings of fact and conclusions of law.

The judgment rendered in this case on August 23, 1961, will be reversed and another rendered instead dismissing the complaint, plus costs, including those of this petition.